# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

---

INTERNATIONAL PAPER COMPANY,

      Plaintiff/Counter-Defendant,

v.                                        Case No. 2:23-cv-02299-MSN-tmp

MEDMARC CASUALTY INSURANCE
COMPANY,

      Defendant/Counter-Claimant.

---

### ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

---

Before the Court are Plaintiff International Paper Company's ("IP") Motion for Partial Summary Judgment (ECF No. 74, "Plaintiff's Motion") and Defendant Medmarc Casualty Insurance Company's ("Medmarc") Motion for Summary Judgment (ECF No. 79, "Defendant's Motion"). Plaintiff moves for summary judgment as to its declaratory judgment claim and the Defendant's counterclaims, while Defendant seeks summary judgment as to all claims, including its counterclaims. The parties have filed responses, replies, statements of material facts, and a fairly voluminous collection of exhibits. (ECF Nos. 75, 76, 77, 80, 83, 84 , 85, 86, 87, 88, and 90.) For the reasons stated below, Plaintiff's Motion for Partial Summary Judgment is **GRANTED IN PART AND DENIED IN PART**, and Defendant's Motion for Summary Judgment is likewise **GRANTED IN PART AND DENIED IN PART**.

### <u>JURISDICTION</u>

The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(a). Specifically, IP is a corporation organized under the laws of New York with its principal place of business in

Tennessee, and Medmarc is a corporation organized under the laws of Vermont with its principal place of business in Virginia. Therefore, the Parties are completely diverse, and the amount in controversy exceeds $75,000.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 permits a party to move for summary judgment—and the Court to grant summary judgment—"if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting the presence or absence of genuine issues of material facts must support its position either by "citing to particular parts of materials in the record"—including depositions, documents, affidavits or declarations, stipulations, or other materials—or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may discharge this burden either by producing evidence that demonstrates the absence of a genuine issue of material fact or simply "by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325 (cleaned up). Where

2

the movant has satisfied this burden, the nonmoving party cannot "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita*, 475 U.S. at 586; Fed. R. Civ. P. 56). The nonmoving party must present sufficient probative evidence supporting its claim that disputes over material facts remain and must be resolved by a judge or jury at trial. *Anderson*, 477 U.S. at 248–49 (citing *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253 (1968)); *see also White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 475–76 (6th Cir. 2010). A mere "scintilla" of evidence is not enough; there must be evidence from which a factfinder could reasonably find in favor of the nonmoving party. *Anderson*, 477 U.S. at 252; *Moldowan*, 578 F.3d at 374.

The Court's role is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Such a determination requires that the Court "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the case. *Id.* at 254. Thus, if the claimant must ultimately prove its case at trial by a preponderance of the evidence, on a motion for summary judgment, the Court must determine whether a factfinder could reasonably find that the plaintiff's factual contentions are true by a preponderance of the evidence. *See id.* at 252–53.

If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the movant is entitled to summary judgment. *Celotex.*, 477 U.S. at 323. The Court must construe Rule 56 with due regard not only for the rights of those "asserting claims and defenses that are adequately based in fact to have those claims and defenses tried," but also for the rights of those "opposing such claims and defenses to demonstrate

in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual

basis." *Id.* at 327.

## **BACKGROUND**

### A.    **Introduction**[1]

This case is a declaratory judgment and breach of contract dispute in which IP contends

that it does not owe Medmarc a duty to indemnify Medmarc for Medmarc's defense costs of

approximately $148,000 that Medmarc alleges it incurred in defending against a pair of lawsuits

brought by the Receiver of Payne & Keller Corporation in South Carolina (the *Childers* and

*Protopapas* suits). IP seeks two declarations that it does not owe Medmarc a duty to pay for

Medmarc's defense costs.  Specifically, IP seeks declarations indicating:

1. That "neither the Champion Indemnification nor any other contractual obligation or term require IP to defend, indemnify or otherwise reimburse Medmarc with respect to the [Payne & Keller Umbrella Policy] or any insurance policy that Dependable may have issued to Payne & Keller."

2. That any "Dependable insurance policy that may have been issued to Payne & Keller, is solely the responsibility of Medmarc."

Medmarc has brought a counterclaim for declaratory relief based on the contention that IP

*does* owe Medmarc a duty to pay for Medmarc's past and future (if any) defense fees and expenses

in connection with the two Payne & Keller lawsuits.  Specifically, Medmarc seeks a declaration

that the *Childers* and *Protopapas* suits fall within the Champion Indemnification and that IP is

obligated to indemnify Medmarc for the costs and legal fees incurred to defend those suits.

Medmarc also seeks an award of $148,125.36, plus pre-judgment interest, for IP's refusal to pay

Medmarc for the past fees and expenses it incurred in defending the Payne & Keller lawsuits.

---

[1] All of the introductory material in this Order is also provided in the Court's Pretrial Order
(ECF No. 104).

IP has also brought a breach of contract action for damages and specific performance against Medmarc because IP contends that Medmarc has refused to consult with IP regarding the remaining liabilities under the two indemnification agreements.

**B.    Undisputed Facts[2]**

1.    Plaintiff International Paper Company ("IP") is a manufacturer of pulp and paper products produced at mills throughout the United States and the world.

2.    Defendant Medmarc Casualty Insurance Company ("Medmarc") is an insurance company.

3.    In 2024, Medmarc employed approximately 30 people.

4.    In an agreement effective September 1, 1983, Dependable Insurance Group, Inc. of America along with four of its subsidiaries, including Dependable Insurance Company, Inc. ("Dependable"), entered into the "Obligatory Retrocession Agreement" with The Omaha Indemnity Company ("Omaha").

5.    In the Retrocession Agreement, the parties agreed that Omaha would do the following as shown at Article I:

> Subject to the provisions of Article III and Article IV, the Reinsurer shall indemnify the Dependable Subsidiaries and their respective successors and assigns (collectively, the "Reinsured Parties"), in respect of the liability which may accrue to any of them under any and all insurance and reinsurance agreements, policies,

---

[2] Unless otherwise stated, the facts in Background Section B are undisputed and are drawn from the parties agreed Pretrial Order (ECF No. 104). Undisputed facts referenced elsewhere may come from Plaintiff's Statement of Material Facts in Support of Its Motion for Partial Summary Judgment (ECF No. 76); Defendant's Response thereto (ECF No. 83-1); Defendant's Statement of Additional Material Facts (ECF No. 83-2); Defendant's Statement of Facts in Support of Motion for Summary Judgment (ECF No. 80-1); Plaintiff's Response thereto (ECF No. 85); Plaintiff's Statement of Additional Facts in Opposition (ECF No. 87); Plaintiff's Response to Defendant's Statement of Additional Facts (ECF No. 89); and Defendant's Response to Plaintiff's Statement of Additional Material Facts (ECF No. 90-1). The same facts are often alleged in multiple of the foregoing documents, but for efficiency's sake, the Court may cite only one document without parallel citations to others.

bonds, binders, certificates, contracts, so-called treaty agreements, cover notes, co-insurance or co-indemnity agreements or other evidences of liability (hereinafter collectively referred to as "Policies"), oral written, now, heretofore or hereafter in force anywhere in the world, produced, underwritten, arranged or contracted for on behalf any of them by any one or more of:

[A]  Frederick F. Stiff, and any of the entities with which he is affiliated, including but not limited to, National Treaty Services, Inc., Atlantic International Management, Ltd., Falcon Brokerage Services, Ltd. and Frederick Reinsurance Company, Ltd.; and

[B]  W.W.J. Hazeltine, and any of the entities with which he is affiliated, including but not limited to W. Hazeltine Associates, Ltd.

(collectively, the "Covered Business").

6.       In the Retrocession Agreement, Dependable and Omaha agreed that "the aggregate amount recoverable hereunder" by Dependable "for any one such loss shall not exceed THREE HUNDRED SEVENTY FIVE THOUSAND DOLLARS ($375,000), except as otherwise provided for in ARTICLE VIII."

7.       In the Retrocession Agreement, Dependable and Omaha also agreed that Omaha "shall be only liable with respect to any and all Policies bound, attaching or renewed (including Policies with retroactive inception dates) by or on behalf of" Dependable "during the term 12:01 A.M., Eastern Standard Time, January 1, 1981, to 12:01 A.M., Eastern Daylight Time, July 20, 1983."

8.       In the Retrocession Agreement also stated:

The Reinsurer shall indemnify the Reinsured Parties for its proportionate share (i.e., the proportion that the amount of the loss payable by it hereunder bears to the full amount of the loss to the Reinsured Parties) of all expenses incurred by any of the Reinsured Parties in connection with the investigation and settlement of losses or alleged losses covered hereunder, including without limitation the cost of litigation, if any, and all other loss expenses of the Reinsured Parties (including a pro rata share of salaries and expenses of the Reinsured Parties' field employees incurred while adjusting such claims or losses and of expenses of the Reinsured Parties' officials incurred

in connection with claims or losses, but not including salaries of the Reinsured Parties' officials or any normal overhead charges, such as rent, postage, lighting, cleaning, heating, etc.).

The Reinsurer's liability for such expenses ("Loss Adjustment Expenses") shall be in addition to, and not restricted by, the limit of liability as set forth in ARTICLE IV.

9.    The Retrocession Agreement further stated:

Dependable alone shall determine whether or not a policy is one "bound, attaching or renewed (including Policies with retroactive inception dates) by or on behalf of any Reinsured Party during the term 12:01 A.M., Eastern Standard Time, January 1, 1981 to 12:01 A.M., Eastern Daylight Time, July 20, 1983" and such determination of Dependable shall be final as among the parties.

10.    After an arbitration between Omaha Indemnity and Champion was conducted in 1988, it was determined that Omaha Indemnity would pay 30% of the Retrocession Agreement liabilities, while Champion would pay the remainder.  (ECF No. 77-1.)

11.    St. Regis Corporation merged with Champion International Corporation ("Champion") in 1985.

12.    At the time that St. Regis Corporation ("St. Regis") merged with Champion International Corporation, St. Regis owned Dependable.

13.    After the merger of St. Regis into Champion, Champion sold the stock of Dependable to Riverside Group, Inc. ("Riverside") in an agreement effective September 10, 1986 (the "Champion Indemnification").

14.    As part of the Champion Indemnification, Champion agreed to pay to Riverside "any and all Losses incurred" by Dependable when one of two conditions occurred, denoted by subsections (i) and (ii) in Section 12.1.

15.    At subsection (i) of Section 12.1 of the Champion Indemnification, Champion agreed to pay Riverside for "any and all Losses incurred" by Dependable "(i) resulting from the

failure of The Omaha Indemnity Company ('OI') to perform its obligations under the certain Obligatory Retrocession Agreement (the 'Retrocession Agreement') effective September 1, 1983 by and among the Company, the Insurers, Dependable Reinsurance Company, Ltd. ('Dependable Reinsurance') and OI."

16.     At subsection (ii) of Section 12.1 of the Champion Indemnification, Champion agreed to pay Riverside for "any and all Losses incurred" by Dependable for "(ii) any matter defined as 'Covered Losses' in Article I of the Retrocession Agreement to the extent indemnity is not provided therefore in the Retrocession Agreement."

17.     The Champion Indemnification defined "Losses" to mean "any losses, liabilities, costs and expenses (including without limitation interest, penalties, attorneys' and accountants' fees, but excluding all employee costs and expenses)."

18.     Section 13.8 of the Champion Indemnification provided as follows:

> The failure of any party at any time or times to require performance of any provisions hereof shall in no manner affect such party's right at a later date to enforce the same. No waiver by either party of a condition or a breach of any term, covenant, representation or warranty contained in this Agreement, whether by conduct or otherwise, in any one or more instances shall be deemed to be construed as a further or continuing waiver of such condition, breach or waiver of any condition or of the breach of any other term, covenant, representation or warranty of this Agreement.

19.     Champion and Riverside entered into the "First Supplemental Indemnification" ("First Supplement") effective September 30, 1987.

20.     The First Supplement is an agreement "supplemental to the" Champion Indemnification with "[a]ll capitalized words and terms" used in the First Supplement that were "not defined in the" First Supplement having their "meanings set forth for such words and terms in the [Champion Indemnification]."

21.     In the First Supplement, Champion agreed to reimburse Riverside for "any and all payments made" by Dependable "in respect of Losses arising out of or relating to the Cravens Dargan Programs," and the Cravens Dergen Programs are listed in Schedule 1 of the First Supplement.

22.     In the First Supplement, Champion agreed to reimburse Riverside for "any and all payments made" by Dependable "in respect of Losses arising out of or relating to the Other Assumed Business Programs," and the Other Assumed Business Programs are listed in Schedule 2 of the First Supplement.

23.     The Champion Indemnification provides that "Seller's and Buyer's obligations under this Article XII shall survive the Closing and shall continue until all such obligations have been performed and satisfied or have been terminated in accordance with the provisions hereof."

24.     On June 16, 1995, Medmarc acquired Dependable.

25.     In an agreement effective September 22, 1995 (the "Written Assignment"), Champion consented to Medmarc becoming the assignee of Riverside's rights under the Champion Indemnification.

26.     In the Written Assignment, the parties agreed that "[n]othing contained herein shall be deemed to enlarge, decrease or alter the Champion Indemnification nor any of Champion's rights and obligations" under the Champion Indemnification.

27.     In the Written Assignment, Medmarc agreed "to continue to consult with Champion with respect to the run-off of the liabilities that are the subject of the Champion Indemnification in substantially the same manner" as Dependable had done prior to its sale to Medmarc.

28.     The Written Assignment states "Champion agrees to maintain the Letter of Credit upon the same terms and conditions as currently in effect, subject to the terms of the Champion Agreement."

29.     IP acquired Champion in 2000.

30.     On December 22, 2021, Medmarc employee Andy Hall sent an email to IP employees Dave Arick and Misti Doose and attached a complaint filed in the South Carolina Court of Common Pleas.

31.     In this email, Mr. Hall stated:

> Consistent with previous Dependable matters, we think this lawsuit falls within the indemnification language of the relevant Medmarc/Riverside/Champion Stock Purchase Agreements and would like to tender these lawsuits to International Paper.

32.     In the complaint attached to Mr. Hall's email, plaintiff Peter D. Protopapas, as the receiver for Payne & Keller Company, sued numerous insurance companies to obtain insurance coverage on Payne & Keller's behalf for an asbestos lawsuit filed against Payne & Keller by Lenora Childers.

33.     Among the insurance companies he sued, Protopapas sued Medmarc as the successor to Dependable and alleged that Dependable had "issued at least one umbrella policy to Payne & Keller" and alleged that Dependable had a "duty fully to indemnify Payne & Keller from and against any and all Payne & Keller Asbestos Suits with bodily injury taking place during any Dependable Policy Period."

34.     Protopapas alleged, "[s]pecifically, Dependable issued umbrella liability coverage to Payne & Keller for at least the policy period March 1, 1976–March 1, 1977" (the "Payne & Keller Umbrella Policy").

35.     Protopapas also alleged that "Defendant Dependable issued *at least* one umbrella liability policy to Payne & Keller ("The Dependable Policy")."

36.     Around the same time that he brought his first complaint against Medmarc, Protopapas also brought a third-party complaint against Medmarc in Lenora Childers' suit against Payne & Keller and made essentially the same allegations as he had in his first lawsuit.

37.     Medmarc tendered this third-party complaint to IP as well.

38.     IP refused the tenders.

39.     Protopapas and Medmarc reached a settlement on January 11, 2024.

40.     As part of the settlement, Protopapas agreed to dismiss his two lawsuits against Medmarc in exchange, inter alia, for a statement whereby Protopapas and Medmarc agreed that "neither Medmarc nor Dependable Insurance Company ('Dependable') insured Payne & Keller."

41.     As part of the settlement, Medmarc also agreed with Protopapas that "Payne & Keller agrees that it will not submit any new claims to Medmarc unless new facts are discovered and that indicate that Medmarc, Dependable, or their predecessors in interest may have insured Payne & Keller."

42.     Medmarc has not tendered the two South Carolina lawsuits to The Omaha Indemnity Company.

43.     As part of its obligations under the Champion Indemnification, IP must maintain a letter of credit in favor of Medmarc.

44.     From 2019-2025, IP paid $18,154.95 in total for letter of credit fees.  (ECF No. 85 at PageID 3150.)

45.     An estimate of the remaining Champion Indemnification and First Supplement liability was provided to IP by Nigel Griffey of Medmarc on May 30, 2019.

46.     The letter of credit balance currently stands at $650,000.  (ECF No. 90-1 at PageID 3905–06.)

47.     The estimate of the remaining Champion Indemnification and First Supplement liabilities that was provided to IP by Nigel Griffey of Medmarc on May 30, 2019, was $615,360.

## DISCUSSION

As a clarifying point at the outset, the present case comes before the Court pursuant to its diversity jurisdiction under 28 U.S.C. § 1332.  Accordingly, the Court "must apply the choice-of-law rules of the forum state," i.e., the state in which it sits.  *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 366 (6th Cir. 2022) (citing *Klaxon Co. v. Stentor Elect. Mfg. Co.*, 313 U.S. 487, 496–97 (1941)).  This Court sits in Tennessee, so Tennessee's choice-of-law rules apply.  "In contract disputes lacking an enforceable choice-of-law provision, Tennessee adheres to the law of the state where the contract was made."  *Blue Grass Stock Yards of Albany, LLC v. Phillips*, 688 F. Supp. 3d 626, 632 (M.D. Tenn. 2023) (citing *Ohio Cas. Ins. Co. v. Travelers. Indem. Co.*, 493 S.W.2d 465, 467 (Tenn. 1973)).  This *lex loci contractus* rule applies in the present case, and the parties agree that, therefore, Florida law governs the contractual provisions at issue.  (*See* ECF No. 75 at PageID 1649; ECF No. 80 at PageID 2899–2900.)  Accordingly, the Court will analyze the parties' contractual disputes in accordance with Florida law. *See* Discussion Sections B & C *infra*.

A.     **Count I of IP's Amended Complaint – Declaratory Judgment**

Both parties seek summary judgment on Count I of IP's Amended Complaint.  (ECF No. 75 at PageID 1640; ECF No. 79 at PageID 2353.)  There, IP asks for declarations indicating the following:

1. That "neither the Champion Indemnification nor any other contractual obligation or term require IP to defend, indemnify or otherwise reimburse Medmarc with respect to the [Payne & Keller Umbrella Policy] or any insurance policy that Dependable may have issued to Payne & Keller."

2. That any "Dependable insurance policy that may have been issued to Payne & Keller, is solely the responsibility of Medmarc."

(ECF No. 63 at PageID 1201.)

The Declaratory Judgment Act empowers federal courts to "declare the rights and other legal relations of any interested party seeking such declaration" only "[i]n a case of actual controversy." 28 U.S.C. § 2201(a). To do this, a party "must show 'a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issue of a declaratory judgment.'" *Safety Specialty Ins. Co. v. Genesee Cnty. Bd. of Comm'rs*, 53 F.4th 1014, 1021 (6th Cir. 2022) (quoting *Saginaw Cnty. v. STAT Emergency Med. Servs., Inc.*, 946 F.3d 951, 954 (6th Cir. 2020)). That requirement echoes longstanding constitutional jurisprudence limiting the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. Significantly, this "rules out advisory pronouncements, which the case-or-controversy requirement has long forbidden." *STAT Emergency Med. Servs., Inc.*, 946 F.3d at 954.

Additionally, "the burden of proof does not change just because the plaintiff is attempting to prove a negative." *Knox Cnty. Election Comm'n*, No. E2012-01094-COA-R3CV, 2012 WL 2146310 at *4 (Tenn. Ct. App. June 14, 2012). In other words, however difficult proving a negative may be, *see Elkins v. United States*, 364 U.S. 206, 218 (1960), a summary judgment movant attempting to do so must still show that a factfinder could so find by a preponderance of the evidence, and that the nonmovant has not marshalled sufficient evidence to show a genuine dispute as to any material fact.

All of this bodes ill for IP's requested declarations, which are extraordinarily broad. Indeed, IP's proposed declarations contemplate not just the policy or policies alleged to have existed in the *Childers* and *Protopapas* suits, and not just any policies Dependable issued to Payne

13

& Keller, but "any policy that Dependable may have issued to Payne & Keller." (ECF No. 63 at PageID 1201.) So, in order to justify the declarations requested, IP would have to be able to show by a preponderance of the evidence that the entire universe of Dependable policies that *may* have been issued to Payne & Keller *must* not fall within the indemnification criteria laid out in the Champion Indemnification and the First Supplement.

Unsurprisingly, the evidence in this case does not go nearly as far as IP requires. While IP is absolutely right that the "Champion Indemnification and First Supplement cannot apply to insurance policies that do not exist" (ECF No. 88 at PageID 3863), it cannot establish that there is *not a single policy* that may have been issued by Dependable to Payne & Keller. IP says that Medmarc agreed with the Payne & Keller Receiver that "neither Medmarc nor [Dependable] insured Payne & Keller." (ECF No. 88 at PageID 3863.) This is true, and undisputed, but must be read in the context of other portions of that settlement agreement that are also true and undisputed. The next paragraphs of the settlement agreement show that Mr. Protopapas and Medmarc are open to "new facts . . . that indicate that Mermarc, Dependable, or their predecessors in interest may have insured Payne & Keller." (ECF No. 80-5 at PageID 3024.) Further, having made this settlement, Medmarc was only dismissed from the *Childers* and *Protopapas* litigation without prejudice. (ECF No. 85 at PageID 3145–46.)

Therefore, the most that has been shown is that Medmarc and Mr. Protopapas agreed *for now* that there is no *known* Dependable policy covering Payne & Keller. Put slightly differently, no one has been able to find the policy that Mr. Protopapas alleged existed. The evidence does not foreclose the existence of that alleged policy or any other policy that may fall within the scope of the indemnities at issue here. The declarations requested would require the Court to opine on an entire set of potential Dependable policies that may or may not exist. Doing so on the record

currently before the Court would be speculative in the extreme.  IP has not produced evidence that would empower a factfinder to conclude either: (1) that Dependable issued no policies to Payne & Keller falling within the Champion Indemnification and First Supplement, or (2) that the policies it may have issued to Payne & Keller fall outside those indemnities.

Furthermore, in granting IP's declaratory judgment the Court would also run afoul of the Declaratory Judgment Act, which requires that the controversy presented be of "sufficient immediacy and reality." *Safety Specialty Ins. Co.*, 53 F.4th at 1021.  Because IP asks the Court to pronounce on the duties imposed by insurance policies that may or may not exist—policies that the parties here may or may not disagree about in the future—the controversy as presented does not have the immediacy and reality required to justify the declarations requested.  Concluding otherwise would enter the territory of advisory opinions, where federal courts are prohibited from venturing. *See Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)) (explaining that federal courts lack authority to "advis[e] what the law would be upon a hypothetical state of facts").

Accordingly, on Count I of IP's Amended Complaint, summary judgment is **DENIED** as to IP and **GRANTED** as to Medmarc.

## B.     Count II of IP's Amended Complaint – Breach of Contract

Medmarc seeks summary judgment as to Count II of IP's Amended Complaint, *see* ECF No. 79 at PageID 2353, which alleges breach of contract by Medmarc.  (ECF No. 63 at PageID 1200.)  IP asserts that Medmarc "fail[ed] and refus[ed] to consult with IP" as required, leaving IP uncertain as to its liabilities under the Champion Indemnification and unable to "accurately valu[e] its letter of credit."  (ECF No. 63 at PageID 1200.)  IP seeks "money damages" and an order

directing Medmarc to "specifically perform its contractual duties . . . to consult with IP regarding the runoff of liabilities subject to the Champion Indemnification." (ECF No. 63 at PageID 1201.)

Under Florida law, in order to prevail on a breach of contract claim, a claimant must prove "(1) the existence of a contract, (2) a breach of the contract, and (3) damages resulting from the breach." *Asset Mgmt. Holdings, LLC v. Assets Recovery Ctr. Invs., LLC*, 238 So. 3d 908, 912 (Fla. 2d DCA 2018) (quoting *Rollins, Inc. v. Butland*, 951 So.2d 860, 876 (Fla. 2d DCA 2006)). Further, Florida law permits "nominal damages . . . where a contract has been breached but for one reason or another recoverable damages were not proven." *Zayre Corp. v. Creech*, 497 So. 2d 706, 708 (Fla. 4th DCA 1986) (citing *AMC/Jeep of Vero Beach, Inc. v. Funston*, 403 So.2d 602 (Fla. 4th DCA 1981)).

Medmarc contends that IP's claim should be denied because IP has failed to show any actual damages from Medmarc's alleged breach. (ECF No. 80 at PageID 2915–18.) To the extent that Medmarc says that IP has not specified an actual figure, that much is true. But it has provided evidence raising a genuine issue as to whether the letter of credit amount—currently $650,000— should have been lower after May 30, 2019. (ECF No. 90-1 at PageID 3905–06.) IP interprets the record to suggest that, in part because "Medmarc has disputed many of the claims it includes in the Champion Indemnification liability estimate and refused to pay them," the liability estimate is erroneous. (ECF No. 87 at PageID 3692–93.) IP therefore asks the Court to "draw the reasonable inference" that if the letter of credit amount should have been lower, then it would have cost less to maintain; as a result, its damages are some portion of the $18,154.95 it has paid over the course of the last five years to maintain a letter of credit amount that was too high. (ECF No. 84 at PageID 3133–34; ECF No. 85 at PageID 3150.)

16

While the Court believes that there is probably enough here to create a genuine issue of material fact as to IP's potential damages despite the lack of specificity, the debate is ultimately immaterial. Because Florida law permits a party to prevail on a breach of contract claim even absent a showing of actual damages, "to overcome summary judgment on the issue of nominal damages" IP need only "show an issue of fact upon which a fact finder could find a breach of duty." *Inspired Cap., LLC v. Howell*, 387 So. 3d 348, 352 (Fla. 3d DCA 2023) (citing *Land & Sea Petroleum Holdings, Inc. v. Leavitt*, 321 So. 3d 810, 817 (Fla. 4th DCA 2021)); *see also id.* ("A fact finder may award nominal damages upon a finding of a breach."); *Leavitt*, 321 So. 3d at 817 ([T]he law allows for nominal damages when a party fails to adequately prove damages for the breach of a contract . . . ."); *Continuum Condo. Ass'n, Inc. v. Continuum VI, Inc.*, 549 So. 2d 1125, 1127 (Fla. 3d DCA 1989) ("[N]ominal damages can be awarded when a legal wrong has been proven, but the aggrieved party has suffered no damages . . . or where . . . recoverable damages were not proven . . . ."). And, regarding a breach of duty, it is agreed that the Written Assignment requires that Medmarc "continue to consult" with IP "with respect to the run-off liabilities that are the subject of the Champion Indemnification." (ECF No. 83-1 at PageID 3070.) IP and Medmarc do not dispute that, for at least some period of time, Medmarc provided "'estimated future' Champion Indemnification liability to IP." (ECF No. 80 at PageID 2915; ECF No. 84 at PageID 3131). The parties also do not dispute that from 2019–2023, "IP and Medmarc *did not speak at all* about future liabilities." (ECF No. 80 at PageID 2915 (emphasis in original); ECF No. 84 at PageID 3131.) Because there is a genuine dispute of fact as to whether Medmarc failed to "continue to consult," thereby breaching the terms of the Written Assignment, there is sufficient evidence for IP to overcome summary judgment even without showing any actual damages.

17

Therefore, on Count II of IP's Amended Complaint, Medmarc's request for summary

judgment is **DENIED**.

### C.    Medmarc's Counterclaims

#### 1.    Count I - Medmarc's Declaratory Judgment Claim

Both parties seek summary judgment as to Count I of Medmarc's counterclaim.  (ECF No.

74 at PageID 1638; ECF No. 79 at PageID 2353.)  There, Medmarc asks for a declaration that:

> IP owes indemnification to Medmarc under the terms, conditions, and obligations in the Champion agreements IP assumed and subsumed when IP purchased Champion, to wit, indemnification of Medmarc for its costs, fees, and expenses related to *Childers* and *Protopapas* lawsuits.

(ECF No. 13 at PageID 417.)

a.    The Anti-Waiver Provision

As an initial matter, the Court takes up Medmarc's argument that in determining whether

IP is obligated to indemnify Medmarc, IP is unable to rely upon an anti-waiver provision in Section

13.8 of the Champion Indemnification.  That section provides that:

> The failure of any party at any time or times to require performance of any provisions hereof shall in no manner affect such party's right at a later date to enforce the same. No waiver by either party of a condition or a breach of any term, covenant, representation or warranty contained in this Agreement, whether by conduct or otherwise, in any one or more instances shall be deemed to be construed as a further or continuing waiver of such condition, breach or waiver of any condition or of the breach of any other term, covenant, representation or warranty of this Agreement.

(ECF No. 77-2 at PageID 1736.)  Later, when the indemnification rights in the Champion

Indemnification were assigned to Medmarc in the Written Assignment, the parties agreed that

"[n]othing contained [in the Written Assignment] shall be deemed to enlarge, decrease, or alter the

Champion Indemnification nor any of Champion's rights and obligations under the" Champion

Indemnification.  (ECF No. 63-6 at PageID 1519.)

18

Against this backdrop, Medmarc asserts that "Medmarc was never assigned . . . the anti-waiver provision." (ECF No. 83 at PageID 3058.) Further, it says, IP is estopped from relying upon the anti-waiver provision both because Medmarc was not a party to 1986 Stock Purchase Agreement (wherein the anti-waiver provision was initially agreed to), and because IP has "waived the ability to rely on it by its course of dealing since 1995." (ECF No. 83 at PageID 3059.)

Medmarc's conclusion misses the mark substantially, first because its interpretation contradicts the plain language of the contract. While it is certainly true that Medmarc was not a party to the 1986 Stock Purchase Agreement, which is the source of the anti-waiver provision, Medmarc was most certainly a party to the 1995 Stock Purchase Agreement, the source of the Written Assignment. There, Medmarc consented to the following provision: "[n]othing contained [in the Written Assignment] shall be deemed to enlarge, decrease, or alter the Champion Indemnification nor any of Champion's rights and obligations under the" Champion Indemnification. (ECF No. 63-6 at PageID 1519.) The benefits of the anti-waiver provision are surely among the rights IP now enjoys pursuant to the Champion Indemnification.

Second, Medmarc's assertion that IP's course of dealing effectively waives the anti-waiver provision is similarly mistaken. Medmarc cites *Gen. Elec. Cap. Corp. v. Bio-Mass Tech, Inc.* for the proposition that "[a]n antiwaiver clause itself can be waived." 136 So. 3d 698, 703 (Fla. 2d DCA 2014) (citing *Williston on Contracts* § 39:36 (4th ed. 2000)). But *Bio-Mass Tech* is not illustrative of Florida cases involving anti-waiver provisions and the concept of waiver generally.[3] Rather, "Florida courts have consistently enforced these [anti-waiver] clauses." *Nat'l Home Communities, L.L.C. v. Friends Of Sunshine Key, Inc.*, 874 So. 2d 631, 634 (Fla. 3d DCA 2004);

---

[3] The Court notes as well that *Bio-Mass Tech* was a case involving waiver only as applied to the right to compel arbitration, which is a unique area of law.

19

*see also All Seasons Condo. Ass'n, Inc. v. Patrician Hotel, LLC*, 274 So. 3d 438, 451 (Fla. 3d DCA

2019) (upholding an anti-waiver provision requiring contract modifications to be in writing);

*Rybovich Boat Works, Inc. v. Atkins*, 587 So. 2d 519, 522 (Fla. 4th DCA 1991) (upholding an anti-

waiver provision where the "contract was unambiguous"); *Inlet Colony, LLC v. Martindale*, 340

So. 3d 492, 496 (Fla. 4th DCA 2022) (favorably citing *Rybovich Boat Works*'s anti-waiver

holding). Accordingly, "the 'defenses of waiver and estoppel [can be] defeated as a matter of law

by the [anti-waiver] provisions of the contract itself.'" *Nat'l Home Communities*, 874 So. 2d at

634 (second alteration in original) (quoting *Rybovich Boat Works*, 587 So.2d at 522). Therefore,

the Court declines to credit Medmarc's argument that the anti-waiver provision has been itself

waived.[4]

Further, though, IP ultimately does not need to rely on the anti-waiver provision, because

there is no evidence in the record to support Medmarc's contention that IP has waived any relevant

portion of the Champion Indemnification. The Supreme Court of Florida has defined waiver as

"the voluntary and intentional relinquishment of a known right, or conduct which implies the

voluntary and intentional relinquishment of a known right." *Major League Baseball v. Morsani*,

790 So. 2d 1071, 1077 n.12 (Fla. 2001) (citing *Kissimmee Util. Auth. v. Better Plastics, Inc.*, 526

So.2d 46, 48 (Fla. 1988)). Further,

> In order for a waiver to occur there must be: (1) a right, privilege, or benefit that
> existed at the time of the waiver and which may be waived;
> (2) the actual or constructive knowledge of that right, privilege, or benefit;

---

[4] While not determinative, the Court acknowledges that this has also been the approach of
federal courts sitting in Florida. *See Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare
Servs., Inc.*, 601 F.3d 1159, 1182 (11th Cir. 2010) (alteration in original) (quoting *Nat'l Home
Communities*, 874 So.2d at 634) ("Florida courts have consistently enforced [anti-waiver]
clauses."); *Inspirations Nevada LLC v. Med Pro Billing, Inc.*., No. 20-CV-60268, 2021 WL
4523616, at *3 (S.D. Fla. Oct. 2, 2021) ("[W]hen a contract contains an anti-waiver provision . . .
the defenses of waiver and estoppel are typically defeated as a matter of law."). *See also
Inspirations Nevada*, 2021 WL 4523616, at *3 (collecting cases).

and (3) an intention to relinquish that right, privilege, or benefit.
*Gratkowski v. ASI Preferred Ins. Corp.*, 351 So. 3d 1216, 1220 (Fla. 2d DCA 2022) (quoting
*Naples Ests. Ltd. P'ship v. Muston*, 327 So. 3d 419, 422 (Fla. 2d DCA 2021)).  Medmarc does not
identify with specificity a "right, privilege, or benefit" that IP enjoys under the Champion
Indemnification, but refers generally to its assertions that "Medmarc tendered to Champion any
and all claims that arose from pre-1986 Dependable policies," "Champion paid each and every
claim tendered by Medmarc," and "[f]rom 2000 to 2022, IP funded all pre-1986 Dependable
liabilities tendered by Medmarc to IP."  (ECF No. 80 at PageID 2901–02.)  Medmarc seems to
indicate that IP has, through the course of performance, waived its right to reject *any* claims from
pre-1986 Dependable policies.

Assuming *arguendo* that such a broad waiver is possible, Medmarc has produced no
evidence whatsoever indicating conduct on the part of IP "intention[ally] [] relinquish[ing] that
right." *Gratkowski*, 351 So. 3d at 1220.  To do so, Medmarc would have to provide some evidence
that IP took action that was inconsistent with its right to ensure tendered claims fell within the
terms of the Champion Indemnification or the First Supplement.  *See, e.g.*, *Raymond James Fin.
Servs., Inc. v. Saldukas*, 896 So. 2d 707, 711 (Fla. 2005) (citing *Klosters Rederi A/S v. Arison
Shipping Co.*, 280 So. 2d 678, 681 (Fla. 1973) ("[A] party's contract rights may be waived by . . .
taking action inconsistent with that right."))  Here, the most that Medmarc would be able to show
is that IP paid all pre-1986 liability claims tendered to it by Medmarc.[5]  Medmarc does not at any
point assert that it submitted—or that IP (or Champion) paid—claims that did not qualify under

---

[5] This is also why Medmarc's course of performance argument fails.  (ECF No. 83 at
PageID 3059–62.)  The Court has been directed to no evidence in the parties's courses of dealing
or performance that would allow a factfinder to conclude by a preponderance that IP had waived
any of its contractual rights or that IP is now *required* to indemnify Medmarc for all pre-1986
claims, regardless of whether they fall within the indemnity provisions at issue.

the terms of the Champion Indemnification or the First Supplement. Accordingly, even assuming

that IP cannot invoke the anti-waiver provision, Medmarc is unable to show that IP has waived

any of its contractual rights.

      b.   IP's Duties Under the Champion Indemnification and First Supplement

In both Counts of its Counterclaim, Medmarc asserts that the *Childers* and *Protopapas*

suits fall within IP's indemnification duties as laid out in the Champion Indemnification and the

First Supplement. (ECF No. 80 at PageID 2910–14.) As mentioned above, in the Retrocession

Agreement, the parties agreed that Omaha would do the following as shown at Article I:

> Subject to the provisions of Article III and Article IV, the Reinsurer shall
> indemnify the Dependable Subsidiaries and their respective successors and assigns
> (collectively, the "Reinsured Parties"), in respect of the liability which may accrue
> to any of them under any and all insurance and reinsurance agreements, policies,
> bonds, binders, certificates, contracts, so-called treaty agreements, cover notes, co-
> insurance or co-indemnity agreements or other evidences of liability (hereinafter
> collectively referred to as "Policies"), oral written, now, heretofore or hereafter in
> force anywhere in the world, produced, underwritten, arranged or contracted for on
> behalf any of them by any one or more of:
>
> [A]  Frederick F. Stiff, and any of the entities with which he is affiliated, including
>      but not limited to, National Treaty Services, Inc., Atlantic International
>      Management, Ltd., Falcon Brokerage Services, Ltd. and Frederick
>      Reinsurance Company, Ltd.; and
>
> [B]  W.W.J. Hazeltine, and any of the entities with which he is affiliated, including
>      but not limited to W. Hazeltine Associates, Ltd.

(collectively, the "Covered Business"). (ECF No. 104 at PageID 4841.) In the Retrocession

Agreement, Dependable and Omaha agreed that "the aggregate amount recoverable hereunder" by

Dependable "for any one such loss shall not exceed THREE HUNDRED SEVENTY FIVE

THOUSAND DOLLARS ($375,000), except as otherwise provided for in ARTICLE VIII." (*Id.*)

In the Retrocession Agreement, Dependable and Omaha also agreed that Omaha "shall be only

liable with respect to any and all Policies bound, attaching or renewed (including Policies with

retroactive inception dates) by or on behalf of" Dependable "during the term 12:01 A.M., Eastern

Standard Time, January 1, 1981, to 12:01 A.M., Eastern Daylight Time, July 20, 1983." (*Id.* at

PageID 4842.)

>As to the Champion Indemnification, the parties agree that:
>
>>As part of the Champion Indemnification, Champion agreed to pay to
>>Riverside "any and all Losses incurred" by Dependable when one of two conditions
>>occurred, denoted by subsections (i) and (ii) in Section 12.1. At subsection (i) of
>>Section 12.1 of the Champion Indemnification, Champion agreed to pay Riverside
>>for "any and all Losses incurred" by Dependable "(i) resulting from the failure of
>>The Omaha Indemnity Company ('OI') to perform its obligations under the certain
>>Obligatory Retrocession Agreement (the 'Retrocession Agreement') effective
>>September 1, 1983 by and among the Company, the Insurers, Dependable
>>Reinsurance Company, Ltd. ('Dependable Reinsurance') and OI." At subsection
>>(ii) of Section 12.1 of the Champion Indemnification, Champion agreed to pay
>>Riverside for "any and all Losses incurred" by Dependable for "(ii) any matter
>>defined as 'Covered Losses' in Article I of the Retrocession Agreement to the
>>extent indemnity is not provided therefore in the Retrocession Agreement." The
>>Champion Indemnification defined "Losses" to mean "any losses, liabilities, costs
>>and expenses (including without limitation interest, penalties, attorneys' and
>>accountants' fees, but excluding all employee costs and expenses)."

(ECF No. 104 at PageID 4843.) The First Supplement, entered into thereafter, is an agreement

"supplemental to the" Champion Indemnification with "[a]ll capitalized words and terms" used in

the First Supplement that were "not defined in the" First Supplement having their "meanings set

forth for such words and terms in the [Champion Indemnification]." (ECF No. 104 at PageID

4844.) In the First Supplement, Champion agreed to reimburse Riverside for "any and all

payments made" by Dependable "in respect of Losses arising out of or relating to the Cravens

Dargan Programs," and the Cravens Dargen Programs are listed in Schedule 1 of the First

Supplement. (*Id.*) Also in the First Supplement, Champion agreed to reimburse Riverside for "any

and all payments made" by Dependable "in respect of Losses arising out of or relating to the Other

Assumed Business Programs," and the Other Assumed Business Programs are listed in Schedule

2 of the First Supplement. (*Id.*)

In the *Childers* and *Protopapas* suits, the Payne & Keller Receiver alleged that "Dependable issued umbrella liability coverage to Payne & Keller for at least the policy period March 1, 1976–March 1, 1977," and that "Defendant Dependable issued *at least* one umbrella liability policy to Payne & Keller." (*Id.* at PageID 4846.) Medmarc reads these allegations such that they fall within the language of the indemnities provided in the Champion Indemnification (including the referenced Retrocession Agreement) and the First Supplement. More specifically, Medmarc says that "[g]iven the extremely vague nature of the contentions made by the Receiver in his complaints against Medmarc as Dependable's successor, the various policies allegedly issued by Dependable to Payne & Keller potentially fall within the scope of the 1986 and/or 1987 Indemnities [i.e., the Champion Indemnification and the First Supplement]." (ECF No. 80 at PageID 2911.)[6] Further, it says, "the evidence produced by the Receiver concerning the type of the alleged policies issued by Dependable to Payne & Keller was a schedule of underlying liability insurance endorsement contained in an excess liability insurer's policy." (*Id.*) Accordingly, this "suggests that the policies Dependable may have issued to Payne & Keller would have been umbrella or excess liability policies, a policy type potentially included within the 1986 Indemnity, which through the [] Retrocession Agreement covered all 'insurance and reinsurance agreements, policies … contracts … or other evidence of liability.'" (*Id.* at PageID 2911–12) (citation omitted).

As an initial matter, the Court acknowledges that *nothing* in the Retrocession Agreement, Champion Indemnification, First Supplement, or Written Assignment purport to imposes a duty to defend upon IP. Indeed, the Retrocession Agreement requires that IP "*indemnify* the Dependable Subsidiaries and their respective successors." *See* ECF No. 63-2 at PageID 1283

---

[6] The extreme vagueness of the Receiver's allegations is not a point in Medmarc's favor; indeed, the lack of detail makes it is impossible to reach any substantive determinations about the character of the alleged policies.

(emphasis added).  Under Florida law, "[t]he duty to defend is entirely separate from the duty to indemnify."  *Eckerd Youth Alternatives, Inc. v. Devereux Found., Inc.*, 366 So. 3d 1154, 1158 (Fla. 2d DCA 2023) (citing *State, Dep't of Transp. v. S. Bell Tel. & Tel. Co.*, 635 So. 2d 74, 78 (Fla. 1st DCA 1994)).  The duty to indemnify is also governed by a different standard than the duty to defend.  The duty to indemnify "is not determined by reference to the claimant's complaint, but rather by reference to the actual facts and circumstances. . . ."  *Mid-Continent Cas. Co. v. Royal Crane, LLC*, 169 So. 3d 174, 181 (Fla. 4th DCA 2015) (quoting *Nat'l Trust Ins. Co. v. Graham Bros. Constr. Co.*, 916 F.Supp.2d 1244, 1253 (M.D. Fla. 2013)).  "The duty to indemnify is narrower than the duty to defend, and there must be a determination that coverage exists before a duty to indemnify arises." *McCreary v. Fla. Residential Prop. & Cas. Joint Underwriting Ass'n*, 758 So. 2d 692, 695 (Fla. 4th DCA 1999).

Therefore, the duty to indemnify cannot truly be established here without, at the very least, reference to the policy that was alleged to provide coverage in the *Childers* and *Protopapas* suits.  The Court does not have that policy; indeed, neither party believes that the alleged policy ever existed.  And Medmarc was dismissed from those suits based on the probability that the alleged policy does not exist and never did.  On this record, therefore, as a matter of law, it is not possible for IP to have a duty to indemnify Medmarc, and IP's motion for summary judgment as to Count I of the Counterclaim could be granted on that basis alone.

But neither can Medmarc properly assert that IP has even a duty to defend, which is governed by a far more lenient standard.  "The duty to defend is determined solely by the allegations of the complaint."  *First Am. Title Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 695 So. 2d 475, 476 (Fla. 3d DCA 1997) (citing *Nat'l Union Fire Ins. Co., v. Lenox Liquors, Inc.*, 358 So.2d 533, 536 (Fla. 1977)).  "An insurer's duty to defend arises from the 'eight corners'

of the complaint *and the policy*." *Royal Crane*, 169 So. 3d at 182 (Fla. 4th DCA 2015) (emphasis added); *see also AIX Specialty Ins. Co. v. Everett*, 543 F. Supp. 3d 1321, 1327 (M.D. Fla. 2021) (quoting *Addison Ins. Co. v. 4000 Island Boulevard Condo. Assoc., Inc.*, 721 F. App'x 847, 854 (11th Cir. 2017) ("'[T]he determination of an insurer's duty to defend falls under the so-called "eight corners rule,"' which refers to the four corners of the underlying complaint and the four corners of the insurance policy."). Along those lines, Medmarc asserts that its counterclaim should be governed by "the potentiality that a claim made against Dependable fell within the Indemnities, not by whether any eventual liability is in fact covered by the IP indemnity contracts." (ECF No. 80 at PageID 2913.)

Here, however, there are not even eight corners to examine. All that the parties and the Court have are the allegations made in the Receiver's complaints against Medmarc as successor to Dependable. As indicated above, there is no extant Dependable policy for the Court to analyze, and, as has been repeated *ad nauseam*, neither the parties here nor the Receiver presently believe that the alleged policy existed at all. Defendant Medmarc has not pointed to—nor has this Court been able to find—any Florida caselaw confirming an insurer's duty to defend when there was no policy even to reference. It beggars belief that an insurer could have a duty to defend merely on the basis of *an alleged policy*. And the allegations in the *Childers* and *Protopapas* suits taken alone do not indicate even the potential existence of a policy falling within the provisions of the indemnities at issue in this case. The Receiver makes no mention of Frederick F. Stiff, W.W.J. Hazeltine, "Policies bound, attaching or renewed" between "12:01 A.M., Eastern Standard Time, January 1, 1981, to 12:01 A.M., Eastern Daylight Time, July 20, 1983," the Cravens Dargan Program, or the Other Assumed Business Programs. *See generally* ECF No. 83-1. The Payne & Keller Receiver alleged that "Dependable issued umbrella liability coverage to Payne & Keller for

at least the policy period March 1, 1976–March 1, 1977," and that "Defendant Dependable issued at least one umbrella liability policy to Payne & Keller." (*Id.* at PageID 3071–72.) Even assuming that some of the policies meeting the conditions of the Retrocession Agreement, Champion Indemnification, and First Supplement were umbrella liability policies, the Receiver's allegations do not reference *any* of the specific policy characteristics in those indemnification provisions. Thus, the record cannot support a determination that the alleged policies would have fallen within the provisions identified.

Therefore, on Count I of Medmarc's Counterclaim, Plaintiff IP's motion for summary judgment is **GRANTED** and Defendant Medmarc's motion for summary judgment is **DENIED**.

> ### 2.    *Count II - Medmarc's Breach of Contract Claim*

Both parties seek summary judgment as to Count II of Medmarc's counterclaim. (ECF No. 74 at PageID 1638; ECF No. 79 at PageID 2353.) There, Medmarc asserts that "IP failed to honor the contractual obligations set forth in the 1986 and 1987 Indemnities, specifically to pay the 'Losses' incurred that arise out of or relate to indemnified matters." (ECF No. 80 at PageID 2914.)

To restate the standard addressed previously, under Florida law, in order to prevail on a breach of contract claim, a claimant must prove "(1) the existence of a contract, (2) a breach of the contract, and (3) damages resulting from the breach." *Asset Mgmt. Holdings*, 238 So. 3d at 912. Because Medmarc is unable to show that IP had a duty to indemnify Medmarc under the applicable indemnities, *see* Discussion Section C.1 *supra*, Medmarc is also unable to show that those contractual provisions have been breached. Therefore, Medmarc's breach of contract counterclaim necessarily fails as a matter of law.

Accordingly, summary judgment is **DENIED** as to Medmarc and **GRANTED** as to IP on Count II of Medmarc's Counterclaim.

<u>**CONCLUSION**</u>

For the reasons stated above, Plaintiff IP's Motion for Partial Summary Judgment (ECF No. 74) is **GRANTED** as to Count I and II of Defendant Medmarc's Counterclaim and **DENIED** as to Count I of IP's Amended Complaint. Defendant Medmarc's Motion for Summary Judgment (ECF No. 79) is **GRANTED** as to Count I of Plaintiff IP's Amended Complaint, and **DENIED** as to Count II of IP's Amended Complaint and Counts I and II of Medmarc's Counterclaim.

**IT IS SO ORDERED**, this 10th day of November 2025.

*s/ Mark S. Norris*
MARK S. NORRIS
UNITED STATES DISTRICT JUDGE